Good morning, Your Honors. May it please the Court, my name is Rebecca Nalban, and I represent Appellant Center for Biological Diversity and Specific Environment. And I'd like to set aside five minutes for rebuttal, if I may. Okay, keep track of the clock. It counts down. Thank you, Your Honor. At issue in this case are two extremely protective statutes, the Endangered Species Act and the Marine Mammal Protection Act. Congress built a conservative bias into these statutes, mandating that the benefit of the doubt be given to the species. This benefit of the doubt, this conservative bias, is extremely important in this case, where we're looking at the rapidly changing environment of the Arctic. We're losing sea ice very quickly. Because of this, the Fish and Wildlife Service listed the polar bears as threatened species under the Endangered Species Act in 2008. The service also last year determined that listing the Pacific walrus is warranted. What we have here is the situation where the Fish and Wildlife Service failed to build this conservative bias into the Chukchi Sea Incidental Take Regulations. And in so doing, it violated not only the spirit, but the letter of the law. If I may, I'd like to start with our Endangered Species Act claim regarding the Incidental Take Statement, then move on to the Marine Mammal Protection Act, and finish with a brief coverage of our NEPA claim. When the polar bear was listed as a threatened species under the Endangered Species Act, the service underwent Section 7 consultation, and pursuant to the Endangered Species Act, produced a biological opinion in an Incidental Take Statement. Unfortunately, the Incidental Take Statement that the service produced is unlawful. The law on what's required in an Incidental Take Statement is very clear. As this Court has said, the service must set a numerical estimate of take in the Incidental Take Statement, or if it can't practically obtain a numerical estimate, it has to define some sort of adequate surrogate. I'm sure. Give me that last sentence again. If they can't give an accurate or adequate estimate of a number, they must? They must define an adequate surrogate for that numerical estimate. I don't read the case law that way. They describe surrogate, but as I read the case law, I tried to really parse it as best I could. I don't see an obligation to provide a surrogate. I see an obligation in the regulation to do the best they can, but there's obviously nothing in the regulation that says surrogate, and our case law refers to surrogate, but as I read it, it doesn't say you have to provide a number or a surrogate. What it says is if you can't provide a number and you give us a good reason why you can't, that's enough. Do you disagree with that? I do disagree with that. So where in our case law is there a requirement if you don't provide a number, you must provide a surrogate? If you look at ONRC v. Allen, the Court held required that the service provide some sort of surrogate, and the purpose of the surrogate is to provide a trigger so that both the service and the regulated industry can know when consultation must be reinitiated. Arizona cattle growers also. So show me where in Allen there's a requirement of a surrogate. It says that a lawful surrogate must be able to perform the functions of a numerical limitation. I've got the case in front of me. Where are you reading? That is at 1038. Okay, I'm on 1038. The language I have in front of me is that the surrogate must be able to perform the functions of a numerical limitation. Well, isn't Judge Fletcher correct, though, that the case law, and Allen in particular, makes it clear that if you can provide an exact numerical estimate, that's what you're supposed to do. If you can't do it, then you've got to explain why you can't. That's part of the problem with Allen, they can do that. And then they have to indicate that if you can't do that, then what can you show us? How can we measure this in the real world in some way? And, again, they didn't do that in Allen. But in this situation, under all three acts, how can you fault what the government did here within its regulations, which are presumably entitled to Chevron deference, but Congress has not explicitly spoken about it. What did they miss? What did they not do? For example, let's take the numbers themselves. They tried very hard, did they not, to try to give an exact estimate, and they explained why they couldn't do that. Is that a fair statement? Are we speaking to the Endangered Species Act? All of them, actually. Let's stay with the Endangered Species Act, since that's what Allen primarily focused on. But, I mean, the issue kind of goes over to all three acts, does it not? The issue does go over to all three acts, but the legal requirements are slightly different. Right. I agree with that. But tell me, if you will, let's stay with the Endangered Species for now. In what way did the government fail to comply with trying to determine exact numbers, or failing that, an explanation as to why it was unable to provide that? The government here, I don't think there's anything to dispute. The government didn't provide a number. I agree with that, but they said they couldn't do it. Why is that reason inadequate? I think that we see in the record that the industry provided estimates of polar bear take in their letter of authorization applications. There have been estimates of take given. In fact, the government, in its most recent Beaufort Scenes and All Take Regulations, which came out last year, did estimate an amount of take for polar bears and walrus. So I do think that it was feasible for the government to estimate take here. You state that, but why did the government say that it wasn't?  That's where the polar bears would be and how the activities would impact them. Is that illogical? No, I wouldn't say that's illogical. But if the government really can't estimate a number of take, then it does have to provide some other sort of trigger so that we know. It sounds like we agree on the first point, which is the government didn't provide an estimate. It gave a reasonable explanation as to why. So then we get to the second prong. Where did the government fail there under the Endangered Species Act? The government provided no realistic trigger for when consultation should be reinitiated. The government now, in its briefs, points to language in the biological opinion. So there's no language in the incidental take statement saying when consultation should be reinitiated. But in the biological opinion, there is regulatory language from 50 CFR 402.16, which just states the circumstances under which consultation should be reinitiated. If, in fact, that is an adequate statement of what they're contending, the fact that it's part of the regulation should not in and of itself disqualify it. No, and what the regulation says is the amount or extent of incidental take is exceeded. In this case, imagine trying to enforce that as a trigger for reconsultation when there's no amount set and the only extent set are these vague terms, small numbers, and negligible impact. There's no actual trigger here. Help me as a practical matter. Assume that it's your office that's trying to figure out numbers or a surrogate. What are you going to do to do that? These are smallish populations. They move around a lot. The data we have of take either under the Endangered Species Act or under the Marine Mammal Protection Act is you see them every now and again. The polar bears don't seem to change their behavior much. What are you going to do to get us precision under the circumstances that we have sort of on the ground, or I guess I'll say it metaphorically on the ground, but on the water or on the ground? Well, one, I don't think we need precision. I think that what we're looking for is an estimate of take. So we don't need to know the exact numbers. So what do you think the government should have done or what would you have done if you were in the government's position trying to comply with the statutory and regulatory requirements? Right. What the government has done in other situations is look at past industry practice, look at the Times past monitoring reports, see how many times the marine mammals have been harassed in the past and come up with an estimate that way. In their most recent efforts, the incidental take regulations, they were able to come up with an estimate for harm. But even if they can't come up, it seems to me it would be easier to come up with a number than to come up with some other surrogate as a trigger. But even if they can't come up with a number, they do need some sort of trigger. And here they're now arguing that the trigger for reconsultation is when a polar bear is seriously injured or killed. That doesn't appear in the incidental take statement. That's in their briefs. But even if that is the trigger. Counsel, with respect, it seems to me your argument is circular. On the one hand, you agree that you can't really estimate with accuracy. And you said the government's explanation was somewhat reasonable. So now we're talking about what the fallback is. And if you look at ER 263 to 264, the government sets forth a four-pronged basis for a requirement for new consultation. It, like you, recognizes that the environment is changing very rapidly. It sets forth these four different bases for required consultation. So, for example, number four is a new species is listed or critical habitat designated that may be affected by the action. So there's one right there. There's a new species that's listed, bang, that takes care of it. Another one is the agency action is subsequently modified in a manner that causes an effect to a listed or critical habitat not considered in this opinion. There's another one. Those are real, quantifiable bases for requiring new consultation. This is unfortunately not a science. It's an art to some degree. I understand your position. I'm just trying to understand what the government did wrong here. They're entitled to Chevron deference, are they not? No, Your Honor, I would argue that they're not entitled to Chevron deference. Okay, why are they not? The Congress has not clarified this issue, has it? It hasn't spoken directly to this point. Congress has spoken directly to the point of – Is there an exact numerical quantification? They have to define an amount or extent of incidental take. There is no amount or extent defined here. Okay, so that's when the agency then promulgates regulations, and it determines how we're supposed to understand what Congress intended. That's what Chevron deference is all about, isn't it? I'd like to go to the statutory language that you mentioned, these four factors. That's the statutory language for reconsultation that's in the statute. Those triggers for reconsultation are present in every biological opinion. It's boilerplate. It was present in the biological opinion in the incidental take statement that was struck down in Oregon Natural Resources Council. There were lots of other things that were missing there. There were other things that were missing, but what the court focused on is that there wasn't a realistic trigger for reconsultation. In this case, if a polar bear is seriously injured or killed, that is coextensive with the action itself. The court in ONRC has said you can't have a trigger that's coextensive with action itself. For example, in ONRC, the action allowed the take of all spotted owls. In this case, the industry could harass every single polar bear in the population as long as it doesn't seriously injure or kill a polar bear, that's okay. But that seriously injure or kill, I don't see that in the record. I see the government making that somewhat silly argument. Exactly. But I'm not sure that if the government actually refuses to reinitiate consultation when you have one of the things that's listed here, one through four, because they say, well, no polar bear has been seriously killed or injured, so we're not doing it. I mean, boy, you've got a good lawsuit. Perhaps. But what we're looking at here is there is no actual trigger in the regulation. So even the industry itself knows when it's getting close to exceeding take, and so Fish and Wildlife Service has an easy way to say the take has been exceeded here. If I may, I'll move on to the Marine Mammal Protection Act. Again, this hits some of the same issues, but the major error with the Marine Mammal Protection Act analysis is that the service uses an illegal regulatory definition of small numbers. The way the service defines it, and I'll read it for you here so it's in your head, small numbers means a portion of a marine mammal species or stock whose taking would have a negligible impact on the species or stock. I think I'm agreeing with you that the regulation as written is wrong. On the other hand, you're not able to challenge the regulation on its face. You're going to have to challenge it as it's applied. And I think in a sense they've recast the regulation in the sense that they're applying it in a way that may be legal, even though the way it's written isn't that. How do you respond to that? So the service is applying the regulation. They quote it in their final rule. They're not denying that they're applying the regulation. And essentially their small numbers analysis amounts to whether the portion of this marine mammal species or stock, whether it would have a negligible impact on that species or stock. The service's small numbers analysis has five factors, the first three of which relate to relative impacts to the population as a whole. This goes to the negligible impact, finding where we're looking at negligible impact to the species or stock. It doesn't go to whether small numbers of individual marine mammals are harmed. I'm a little confused. Judge Fletcher made the point that it's too late for an APA attack here on the regulation. It's done. And even though the regulation may be at variance somewhat with the statute, it's declared we're stuck with that. But here, tell me why you believe that the agency's use of the regulation here, its application, violates its own regulation. Why it violates its own regulations. I would say it violates the statute. Okay, so we're back to statute again. You're attacking the regulation, which you can't do here because time has long since passed to attack the regulation. How do we get around that problem? Your Honor, the agency in this case is relying on this illegal regulatory definition. In NRDC v. Evans, this is a very similar case to NRDC v. Evans where the service was relying on this same illegal regulatory definition of small numbers. I can't remember whether that case dealt with an attack on the regulation. It was exactly as here. It was an as-applied challenge to the agency using the regulation to define small numbers. But here, the crux is that the agency's small numbers analysis doesn't guarantee small numbers. It guarantees a negligible impact. And if you think about it in terms of a large population like Pacific walrus, at the time of the rule they estimated 200,000 walrus in the entire population, 200,000 walrus. Even if we could agree that in the abstract 10% is a small proportion of the population, and maybe that's a negligible impact to the population, if you think about 20,000 individual marine mammals. I understand perfectly your point. There are two separate requirements. One is a small number and the other one is negligible impact. But it seems to me that what the agency did here can be read in terms of what it did, not in terms of the regulation, but in terms of what it did, is that it performed both a small numbers analysis and a negligible impact analysis. The small numbers analysis, in my reading, Your Honor, is still conflating small numbers with negligible impact because in this five-factor analysis they speak about a proportionally smaller number of animals compared to the population as a whole, a relatively small geographical area. It's all relative to the population as a whole, which is in a large population that certainly has a negligible impact. It doesn't go to individual marine mammals. Why don't we hear from the government? You asked to save five. We're down to about one minute and 22 seconds, but we'll make sure you get enough chance to respond. You'll get to say what you need to say. May it please the Court, I am David Shilton representing the U.S. Fish and Wildlife Service. I plan to give four minutes of my time to Mr. Aleppo representing the interveners. I think plaintiffs are overlooking a critical fact in this matter, which is that there have been eight prior incidental take regulations issued for routine oil and gas activities, seven in the Beaufort Sea, one prior in the Chukchi Sea. And as this Court found in the Center for Biological Diversity versus Kepthorne case involving the Beaufort, these have been very successful in assuring that these oil and gas activities have only negligible effects on polar bears and walrus. And there's no evidence the operations during the times these regulations have been in effect have ever had other than a negligible effect. And so I think plaintiffs are attempting here to impose a rigid numerical requirement, numerical limit. It's really an instance of a solution to a problem which doesn't exist. Don't overstate your case in terms of, I mean, I don't think they have ever said we want a rigid numerical limit. But I think any numerical limit would be, in a sense, arbitrary, or certainly in this case it would be. But, I repeat, I don't think they're asking us for a specific number. Well, I think they are asking the Court to read the statute to require that the small numbers analysis be done in terms of establishing a numerical limit or a numerical estimate. As I heard the argument, as I read the brief, they would be fully satisfied with what they view as an adequate explanation as to why you can't come up with a specific number, including, for example, some surrogate. They have not asked for a specific number. If that's the case, then I want to point out that I think the Fish and Wildlife Service did come up with an adequate explanation of why it was not practical in this case to come up with a numerical limit. And that was in terms of really two factors. The first factor is that in doing a five-year regulation, they don't know what industry is going to propose over that five-year term. You've been hearing me sort of picking on the other side. I'll pick on you now. I'm now going after ESA because I think that's where you're the most vulnerable because that's where the statute imposes a more specific requirement, that they actually want a number unless it's impractical to provide it. The explanation that you give is on ER 231, page 21 of the Incidental Take Statement. It's really short. You say, and I'll read the whole thing because I can do it in about 20 seconds. The dynamic nature of sea ice habits and its influence on the seasonal and annual distribution and abundance of polar bears and walruses in a specified geographical area, eastern Chukchi Sea, limits the service's ability to provide operatory numerical estimates of the number of Pacific walruses and polar bears that might potentially be impacted in any given year. That's it. Don't you have anything more to say? Yes, and what's more is in the MMPA, the Incidental Take Regulation, because the two are linked. Now, I think it's important to understand the relationship between the Endangered Species Act and the Marine Mammal Protection Act because the Endangered Species Act only applies take prohibitions to a threatened species to the degree that the Fish and Wildlife Service has exercised its discretion by regulation to impose those requirements. It has done that with polar bear in the so-called Section 4D rule, but in promulgating that rule, it makes very clear that, as the Service has found before, basically the protections of the Marine Mammal Protection Act are stricter than under the Endangered Species Act. Let me just be sure as you're going through this. Do I understand you to say that in answer to Judge Fletcher's question, that what he read with respect to the Endangered Species Act should be read to be augmented by the statement in the MMPA? Is that right? That's correct. Is there anything in that document that says so, or are you just looking at this as part of a single application, and this has to be read as a universe in tear? I don't know if I can point you right now to language which talks about that, but the two are linked. Let me see if I can. Do you have any regulation or any rule of construction that would permit us to link these two? Because I, like Judge Fletcher, find your initial statement on that to be rather cryptic, whether it's adequate is another matter, but what gives us the authority to link our analysis of that statement with something in the MMPA? I believe Excerpts of Record 261 talks about the relationship between this incidental take statement and the incidental take regulations under the MMPA. And the fact that the 4D rule that makes the take prohibition applicable basically says that if you are exempted under the incidental take rule of the MMPA, then you are also protected under the Endangered Species Act. That's 261? Yes, that's the 261 to 262 is where that explanation is, and so that's what I think. But in a way, that's not quite right because under the Endangered Species Act, you're required to come up with a specific number unless you've got a valid reason not to, and that's not true for the MMPA, am I mistaken? Well, the case law has interpreted it that way, and I think that we can find... So therefore, if you're saying that our analysis under the MMPA takes care of the problem of giving a small number or giving an excuse why we can't come up with a small number as a number, well, no, because MMPA has a different requirement. Well, the language you read from the biological opinion itself, I think while it's brief, it adequately summarizes the reasons why you can't practically come up with a number, and I think that can be augmented with the fuller description that's in the preamble to the MMPA incidental take rule, which explains that because of the nature of where polar bears, where their habitat is and the ice shifts, it's hard to predict in advance. It's unlikely to be in the area where oil and gas activity is going to occur, and we again don't know what the oil and gas activity is likely to be over the next five years. Given all those uncertainties, there's simply no way to practically predict how many polar bear will be taken. But it is important that part of the take restriction is that there are no lethal takes of polar bear. And so when the re-initiation requirement says that consultation shall be re-initiated if the extent of take is exceeded, that does mean that if a single polar bear is killed or injured, that re-initiation would have to occur. Well, it better not mean that that's the only trigger, meaning I don't read take to include only injury or death. Right. Well, if there's new information that arises, that would have to be taken into consideration. And also, since the two are linked, since the incidental take statement of the ESA is linked with the MMPA, the MMPA itself provides provisions for during the five-year term of a regulation that it can be suspended or revoked if it looks like there is going to be more than a negligible effect on a species or stock. So if it turned out that after a couple of years the National Wildlife Service were to see that there is being more than a negligible effect, it could revoke or suspend the incidental take regulation, and that would also mean that there's no ESA protection. Can I change the focus for just a second? As you know, the felons have relied extensively on ONRC versus Allen. Can you tell us why your case is distinguishable from Allen? Right. The problem in Allen was that the incidental take statement limit was coextensive with the project itself, so you didn't get re-initiation unless all of the owls in the area of forest that was going to be cut down were taken. And so practically it couldn't have happened before the end of the project. Here it could happen before the end of the project because if a polar bear is injured at any time, that would require re-initiation. Also, I think just the nature of owls in a forest that's going to be cut down is very different than the situation here, where unlike cutting a forest, you know that's going to have an effect on nesting owls. You don't know with a five-year regulation what activities the oil companies are going to propose, whether it's going to be seismic or exploratory drilling, where it's going to be. And unlike owls, where you pretty much know where the nests are, polar bears, they're going to be wherever the ice is and that moves around a lot. So I think there are a lot of factual differences between them. Help me as a practical matter. What we're talking about here is exploration rather than production. That's correct. How much of this exploration activity when we're off the land will take place in open water and how much of it will take place either by displacing ice or on top of the ice and so on? Because the polar bears, by and large, are not going to be in the water. So how much impact on the ice is this going to have? The exploration is all done off of the ice because it has to be done in open water. Seismic is your towing air guns. That has to be done in open water. I understand that what they have as part of their equipment is icebreakers. So they may be creating open water by moving the ice to one side. For exploratory drilling, that takes place in open water, but there is a chance that ice could move into the area, and so they have icebreakers there to push the ice away if it does. And that could impact a polar bear if it was on the ice. So they have mitigation requirements to assure that if there are polar bears, they won't be substantially disturbed. So most of the exploration, most of the concern has been with the seismic, but the exploratory drilling, you do have icebreakers. But looking at the whole of that five years looking forward, I think it was very reasonable for the agency to conclude that only small numbers were likely to be affected, likely to be taken. That's a reasonable judgment within the agency's technical expertise, and as such has given a great amount of deference in reviewing it. If we were, and I'm just arguing here, if we were to find the explanation provided by the agency under the ESA blank to be inadequate and we were to send it back on that issue alone, what would the agency do to respond to deal with the issue? What would it be saying? How would it respond? Well, it would presumably have to do a new incidental take statement with a better explanation. It would have to take a look at the status of the 4D rule itself because that's critical, too, and that's kind of complicated because that one is in litigation in D.C. But the task, I think, would be to take another look and provide a better explanation. And, of course, this only affects the polar bear, not the walrus. But you recognize the rather cryptic nature of the response in a statute that does seem to require, where possible, some specific numerosity. Well, while it is short, again, I think you can look at the explanation in the preamble to the MMPA, and I think that the purpose of the incidental take requirements was fulfilled here by having a trigger, which is a realistic trigger and can happen during the course of the five-year period. And I think the protective provisions of both acts are being furthered here, and that's shown by the record over the last two decades of oil and gas operations, which have not resulted in any fatal takes of either polar bear or walrus, and there's no evidence of any harm generally to these species. So I think it is a program which is working. Well, in this case, it's more than whether the program is working. It's whether you've complied with the regulations in the statute, right? Oh, absolutely. And I want to emphasize that on the MMPA issue, the small numbers issue, that the agency did take a separate look at small numbers, separate from its finding about negligible impacts. And while the two are related, naturally, I mean, the whole point of that MMPA provision is to avoid anything but negligible impacts, and so it's not surprising that the small numbers analysis refers to negligible impacts. But the negligible impact analysis goes further and looks at, you know, how are those small numbers being affected? What behaviors might be affected? So the two analyses are different, and I think that that complies with the statute. Thank you. I'll rest my time to Mr. Lepman. Thank you. Good morning, Your Honors. Are you following us around? I am, Your Honor. Or you're dragging me around, I think may be the case. Good morning. Today I'm representing the intervener, Alaska Oil and Gas Association. And we know your name, of course, but for the record. My name is Jeff Lepo, for the record. And AOGA, the Alaska Oil and Gas Association, was the party that petitioned for these incidental take regs, as they did for the previous ones, as they have for subsequent ones. My original intent, actually, was to talk about context again, which is a familiar theme. But you've asked some questions. I think I'll go in a different direction and try to respond to some of the questions you've raised. I want to first confirm or reconfirm that what Mr. Schulten said is true, that these operations all occur in open water. There's a open water season in the Arctic. It begins at the earliest on July 1st, which is a conservative date. It ends at the latest on October 31st. This year is a big ice year, and so actually the open water doesn't exist, won't probably exist on July 1st. So there won't be any operations occurring until there is. They don't use icebreakers to create open water. You definitely could not do that for seismic. You have to have open water, substantial areas. But icebergs roll through, and you can't have a titanic situation. And so they have very large icebreakers there to deflect away icebergs that might come down. And when you say icebergs, again, this is practical stuff that I just don't know very well. An iceberg to me is this great big lumpy thing with a lot of underwater and so on. How about pack ice in which the polar bears might be doing whatever they're going to do, hunting or whatever? Is the pack ice something that would be shoved away as well? Well, Your Honor, I mean it's not inconceivable that there could be a shelf of ice that would break off, let's say, and come down, and there could be a polar bear on it. The time of year when they operate and the kind of operations that occur, they can't really operate in those circumstances. And even a drill ship such as would be out there for exploration drilling would actually have to move if there was a large. They'd have to emergency mobilize and move out of the way if there was a large shelf. You can't divert around that kind of thing. So typically these operations occur at times when the shelf is way far away, and that's the concept under which they're out there at that time. In terms of timing, is any operation, exploratory operation for this season dependent upon issuing a decision or not? I don't think I can answer that. I mean there have been exploration that has gone on under this provision. This is a five-year provision that's in its fourth. Well, I guess it's heading into its fifth year, so there's about a year left on it, and there have been operations conducted under it. There are two forms of incidental take that are authorized under the MMPA. One of them is under these regulations, and then you get letters of authorization, LOAs. There also are incidental harassment authorizations, IHAs, which are good for only a year. And for operations that are occurring this summer, it's possible that operators have obtained IHAs instead of LOAs, and those wouldn't be affected by this decision. I guess my question is a different one. Obviously, if we were to hold that there's been no compliance, I guess you'd have to stop and make sure you'd go back and get the proper documentation and so on. If it was an operation that was anticipated to have an effect on polar bears or walrus, that's correct. Well. I mean there are operations that might not. As discussed in the briefing, the MMPA doesn't authorize the activity. But if you have an incidental take and it's not authorized, then you've violated the law. Then the activity may have to be suspended. If somebody sought to enforce against you, that's correct, Your Honor, you would. And they wouldn't proceed with any intention of violating the law, no, and that's why they have these incidental take and regulations. But I guess what I'm trying to understand, just as a straightforward practical matter, what difference does it make as a practical matter to either side? Assume for the moment that you win totally and then assume for the moment that we say, for example, that there's been a failure to comply with ESA. What's the practical consequence of our deciding soon or late in either direction? I don't think that any of us know the answer to that. There is exploration that is planned for this summer, exploration drilling. Essentially, the seismic activity that was planned has already occurred in previous years. But there is exploration drilling planned for this year. Whether if you made a decision tomorrow, it would impact that or not, I cannot say, because it depends upon whether they have an IHA. I don't represent the party in their obtaining their permits. If they had an IHA or if they obtained an IHA, notwithstanding your decision, they could still proceed and have incidental take of polar bears and walrus. So it depends on the authorizations that they have, and I don't know the answer to that. I'm not trying to avoid your question. We're kind of arranging deck chairs on the Titanic. I'm sorry? Never mind. Okay. No, I hope not. I hope not. I wanted to address your question, Judge Smith, about what happens if you send this back? What does the U.S. Fish and Wildlife Service do? And the point I wanted to make there is, and this sometimes happens, certainly, is that they would go, I don't represent the Fish and Wildlife Service. This is my interpretation. I believe they would go back and they would come up with a number. And that number would have the appearance of precision but would be, nevertheless, a very imprecise number that had the appearance but not the reality of satisfying an abstract concept of being numeric. Because in this context, now, you know, we're four years into this. We actually know quite a bit about how many interactions there have been. But looking out to any five-year period, you don't know where the activities are going to occur. You don't know what the circumstances are going to be. We all agree that the climate is changing and that it's a very dynamic environment. And so they would come up with a number that would satisfy the abstraction. But it would only have the appearance. Either way, it's kind of meaningless. It is, I believe, Your Honor. And what's particularly meaningless here is that oil and gas operations have been occurring for 50 years out there. And they've been occurring for 21 years under these incidental take regulations. And there's a lot of things we don't know about the Arctic. And there are a lot of things we don't know about marine mammals and probably never know all those things. But there's some things that the Fish and Wildlife Service knows to a high degree of certainty and was able to determine with a great deal of certainty. And they are that there are very few interactions that result from oil and gas operations. That oil and gas operations are not a threat. There are many threats, important threats to polar bears and walrus, but oil and gas operations are not among them. That to the extent there are interactions, they're very minor. No injuries, no detectable injuries, and no mortality. In the whole history of oil and gas operations off the North Slope of Alaska in the Outer Continental Shelf, there's never been a detectable effect on polar bears or walrus to their population or subpopulations. Never been one. And the mitigation that's been implemented under these provisions has been wildly effective. The fact of the matter is, and I hate to confess this, I've been practicing environmental law for a little over 30 years. I can't think of a statute in a situation, an environmental statute, that has fulfilled the purposes of Congress to the full extent that Congress hoped and intended, except for this one. Here's a situation where they protect polar bears and walrus, and there's never been a detectable effect in the whole history of these operations. Now, that to me is a statutory and regulatory scheme that is working extremely well, and I can't think of another example of that. I had one other point. You're over, so talk fast. Okay. I wanted to suggest, this is Excerpts of Record 262. It's the biological opinion. It's the section dealing with incidental take. And in the second to last paragraph of the incidental take section, here's a statement. While the service cannot anticipate the specific amount or extent of other types of take that may result from activities that may be authorized. I'm sorry, what page are you in the middle of that second full paragraph? Excerpt 262. Yeah, yeah, okay. It's the middle paragraph. It's the last. Three lines in. Okay. Last sentence. Yep, got it. While the service cannot anticipate the specific amount or extent of other types of take that may result from activities that may be authorized under the regulations until they are proposed and the specific activities and location is known, the negligible effects finding in the small numbers determination articulates the anticipated amount of take with respect to effect on the population. So this is a situation, it's an unusual situation under the ESA, but you have the interplay between ESA and the MMPA. And what they've done here is they've said, well, we can't articulate a specific number. We have some MMPA concepts, some qualitative requirements. It has to be a negligible impact and it has to be small numbers. And we know that they've determined, and this was true of the district court in Washington, D.C., that had the In re Polar Bear case, that the negligible impact standard is a more stringent standard. It is a standard that is more conservative than jeopardy under the ESA. So this action by definition cannot rise to the level of jeopardy because the negligible impact is far more conservative. Yeah, I got that. But the question under the place that you're vulnerable under the EPA is the numbers question. But my point is these concepts, okay, they're qualitative. They're not quantitative. But nobody has struggled to apply them in this situation. They've worked extraordinarily well. And although they've referenced here a qualitative standard because they can't come up with a quantitative one for the reasons they've explained, it is nevertheless a surrogate. It is a standard that has been applied over and over and over again successfully. Thank you, Your Honor. Thank you. Appreciate your patience. Okay. We'll let them go over. Say what you need to say.  Thank you very much, Your Honor. First, I'd like to address the question that you asked, Mr. Aleppo, regarding the practical impact of your decision today. The activities, SHELS activities for this summer are moving forward under these incidental take regulations. They have letters of authorization under these incidental take regulations. And that is their entire coverage for their planned take of polar bears and walrus. So if this court were to strike down the regulations, SHEL would be in a position of this. If the court were to rapidly strike down the regulations before SHEL moves forward, SHEL would be in a position of having to get new authorization. It could do that through the one-year IHA process. It doesn't have to go back and get new incidental take regulations. But I think there's no dispute that SHEL's plans would impact polar bears and walruses and would require additional incidental take coverage. I guess, well, there are a number of points. One thing that we're hearing is that it's hard to estimate a number because the scale of activity is so large. The purpose, the Marine Mammal Protection Act only requires incidental take regulations for a specified activity. If the area of activity is so large and vague that we can't figure out how the marine mammals are going to be harmed, then we have a problem with the statute. The service determined here that this amount of activity was small enough, a small enough world of activity, that it could determine the impact on the marine mammals. And that's why it needed, in this case, to say what is a small number of marine mammals, how many marine mammals are going to be impacted. The industry is required to provide a number when it submits an application to the service. Saying it wants to take marine mammals, it has to give the service a number. So the service, had it demanded those numbers from industry, which it didn't do, had it demanded... Hypothetically, that they did. Mr. Leffel suggested that were that to happen, they'd just simply put in a number. Would that just spike your guns at that point? You wouldn't have anything further to say? Depends on the number. Say it's one that industry gave. So, for example, the most recent Buford Sea Incidental Take regulations said that 10 walrus are going to be harmed a year. I would not come to court and argue that 10 walrus isn't a small number. But they said we estimate that. We estimate 10 walrus. Nobody knows exactly, right? Right. It sounds like it's a guess under any circumstances. But if there's a number there, you'll leave it alone. If they put in a concept, that doesn't work. Is that a correct statement? It does depend on the number. But if they say 200,000 walruses are going to be impacted, then that's not a small number. Would you agree that whatever number they come up with, there's no basis for being able to predict anything accurately? It's just fluff. No, it's not just fluff. What number would you put? On walrus polar bears? So what we got from the industry applications in 2006, if you pull together their applications and look at the number of seismic surveys in these regulations, what we came up with is the number, which is a lowball estimate of 60,000 walruses, would be impacted over the life of the regulations. So let's say that the government said, we really can't estimate this, but we're going to adopt the industry's proposal, we're going to say 60,000. Would you contest that? That question isn't before you. I'm trying to understand practically what, in response to Judge Fletcher's question, it sounded like it really doesn't matter what we do. I mean, obviously there will be some law on one way or another, but it really doesn't sound like it makes a whole lot of difference, certainly this summer, because they're going to go ahead and do whatever they're going to do anyway. It does matter because that number provides a trigger so that the industry and the agency know when take has been exceeded. And earlier Your Honor asked where in the case law did ONRC specifically say we need a trigger. And I'd just like to read from you briefly, and I would read ONRC carefully because it has a lot of applicability to this case. But the court held that the incidental take statement at issue in this case is arbitrary and capricious on several counts. Now what page are you reading from? Sorry, that's 1041 on ONRC. I'm talking about Allen. In the conclusion. Allen? ONRC v. Allen, yeah. Okay, so I'm on page 1041. In the conclusion, the incidental take statement at issue in this case is arbitrary and capricious. And if you go down to the third reason, this circuit has previously invalidated incidental take statements that could not adequately trigger reinitiation of consultation. The incidental take statement as currently drafted could never trigger the reinitiation of consultation because, by definition, the permissible take level is coextensive with the scope of the project. That's the case here. The only way to trigger reconsultation is if a polar bear is seriously injured or killed. I'm sorry. And I guess just as sort of the overall picture, there's a lot of talk about Mr. Leppo said that the industry operations haven't had any impact on polar bears and walruses in the past. Just so you understand, he's a lawyer for the other side. He's telling me everything is wonderful. Lawyers tell me that all the time. We just generally feel that things are wonderful. Right. We're being told that all the time. I look at the record. I don't look at, you know, if lawyers tell me things that are factual and they're not in the record, I ignore what the lawyers tell me. Okay. So, fine. Just to point out that the Marine Mammal Commission, which is... You tell me things are awful, I'm not going to believe you either. Okay. Well, I'll point to what in the record says that things are awful. The Marine Mammal Commission, which is the congressionally appointed body that's supposed to advise... It's an independent scientific body that advises on marine mammal issues, has repeatedly opposed these regulations. In this case, it said that the Fish and Wildlife Service should defer issuing the regulations. And so, there is this idea that there's no harm is not necessarily supported by independent science. I'll leave it at that. Thank you both. Very nice arguments on both sides. The case of Center for Biological Diversity versus Salazar is now submitted for decision, and we are in adjournment. Thank you very much. All rise.
judges: Goodwin, Fletcher, Smith